in this case. Mr. Naranjo is a young man who was sentenced unjustly and unfairly and unreasonably, and the sentence was legally incorrect. He received a sentence of 324 months for being a minor participant in the conspiracy. He was held responsible for a methamphetamine lab that operated prior to his participation in the conspiracy, and the sentence was clearly unreasonable. I would like to start out by discussing the six-level enhancement pursuant to 2D1.1 for the risk of harm. It is clear from the record that this methamphetamine lab operated prior to Mr. Naranjo's involvement in the conspiracy. All the evidence indicates that this stopped before the first shipment of pseudoephedrine arrived at that residence, and all the evidence is that Mr. Naranjo participated in the conspiracy from that first shipment on. He cannot be held responsible for relevant conduct. The first shipment of that was Enormous. Is that correct? That's correct. All the shipments were large quantities of pseudoephedrine. Well, all right. Enormous will do fine. Okay. But that doesn't make Mr. Naranjo responsible for a methamphetamine manufacturing operation which occurred prior to his involvement in the conspiracy. Well, it does make him responsible for the stuff that was manufactured out of the shipments he handled, right? Well, he pled to the charge he pled to was that he was aiding and abetting the manufacture of methamphetamine. However, there's no evidence about how that methamphetamine was manufactured. The six-level enhancement is for a particular operation. It was designed to further punish people who were not only making meth, but making it in a very dangerous way and endangering the lives of others, the lives of children. Mr. Naranjo had no involvement in any of that, and we don't know how the methamphetamine that may or may have been manufactured occurred. So he can't be held responsible for that. There's scant evidence that Mr. Naranjo even knew about this methamphetamine lab. The only evidence was the cooperating codefendant, Mr. Orozco, stating that in Mr. Naranjo's presence, the supervisor, Mr. Gamis, told Orozco to tell Timo to get his equipment out of that area. So all foreseeability is that even if Mr. Naranjo knew a lab had been there, his awareness was that the person manufacturing there was going to take that stuff away. And in fact, Mr. Naranjo's other job, other than unloading the boxes, was to take the pseudoephedrine to another location. So there's absolutely no evidence that Mr. Naranjo knew any methamphetamine was ever manufactured there during his involvement in the conspiracy, and he just can't be held responsible for that. And that's a six-level enhancement that increased a sentence from 168 months all the way up to 324 months, which is clearly an unreasonable sentence for somebody who was a minor participant in this crime. Mr. Naranjo should have received a role reduction based on his minor participation. This conspiracy and the government had a lot of evidence that this originated in the Middle East, was conducted throughout the United States and Canada, and into California. Mr. Naranjo's involvement was to stand on the tractor-trailer, move the boxes from the back of the tractor-trailer to the front so other people could unload the boxes. He then, on occasion, came and took some of those boxes and delivered them to another location. He had no supervisory control. He gave no orders. He never touched any money. He never procured any drugs. He never made any drugs. He was the lowest person on the ladder, and yet he received no role reduction. Mr. Amud, who did receive a role reduction, was a supervisor. When Mr. Naranjo was lifting the heavy boxes, Mr. Amud was standing in the garage waiting for those boxes to be unpacked so that he could see whether the right amount had been unpacked and he could report to his supervisors. This is someone clearly with a more involved role than Mr. Naranjo, and he received a role reduction. What we're going to do, we're going to decide this case on the record before us. When we look at this record, will we see that he honestly discussed with the government everything that he knew and could know about this case? Well, if you're talking about as far as the 5C, it's the record is that he did not meet with the government, and that seems to be from the indications from the record and from my discussions with the attorney, it was the attorney's fault that he never met with the government, not Mr. Naranjo's. Well, the only thing we know is on the record he didn't do it. He didn't meet and he didn't discuss. Did he? He did not meet with the government. There was no meeting with the government, but he made a statement to probation. He made a statement in open court about his involvement. There was a cooperating codefendant, Mr. Marosco. He testified, and there was a three-day sentencing hearing. So if there was any other evidence about Mr. Naranjo's involvement, Mr. Marosco would have testified about that. He had an opportunity to discuss this with the government, and he declined. Didn't he? Well, his attorney declined on his behalf. Do you think, really? Do you really think that we should sentence the attorney? Well, I — I mean, sometimes I'm tempted. Well, you're looking at a 24-year-old first-time offender who's unsophisticated. He thinks he's very smart and he can make a lot of money dealing in some — did he know what was being dealt? He knew that the pseudoephedrine would be used to manufacture methamphetamine. That's what he admitted to. I knew it. That's what everybody in the case admitted to. And there was also another cooperating codefendant. Did he participate in the distribution? He took some of the boxes in a truck to another location. Did he participate in the distribution? Sure, he participated in the distribution. But that is all he did. It's clear that all these other people, the ones that were, in fact, arrested, there's a vast amount of people that were never arrested that are fugitives, that had much more major participation. Maybe it's so, but we are looking at his sentence. Right. And we have to look at what he did, what this record shows that he did, and what this record shows that he could have done that he didn't do. Isn't that what we have to do? But I don't think he could be sentenced on what he could have done, what we speculate that he may or may not have known. We don't have to speculate. Did he cooperate with the government? The answer is no, he didn't. He did not meet with the government, but he made a statement in open court and he made a statement to the probation. And you asked about the attorney. It's never been my experience that a defendant on his own can go to the U.S. Attorney's office and say, I want to cooperate or I want to sit down with you for a 5C. This is done through the attorney. What in this record shows that he did anything toward cooperating? The record shows that he had the opportunity to do it. And what does the record show? The record shows that the attorney stated that he didn't believe that Mr. Ronho had anything to add and it would be a waste of the government's time. And Mr. Ronho ---- Counsel, I have a question on this. This is a direct appeal, right? That's correct. So, I mean, it seems to me if he didn't make a proffer to the government, that he's out on the safety valve. And maybe, you know, you could seek some habeas post-conviction relief for the record on ineffective assistance of counsel on that issue. But I don't see what we can do about that. The issue I'm concerned with is this six-level enhancement. So there, as I understand it, the ---- there has to be evidence of harm to minor, right? That's correct. And your position is that wasn't shown by clear and convincing evidence. That's correct. What wasn't shown was that Mr. Ronho had any involvement in it, even knew that the lab was there, and that the whole operation that could have harmed the children took place prior to Mr. Ronho's involvement. So he's not the one manufacturing meth. He's not the one who even knew the lab was there. It's clear from the record that this lab is behind the garage, behind a chicken coop, with a padlock door, with a trap door, hiding the chemicals. Mr. Ronho is the guy unloading the boxes in the garage. The cooperating co-defendant stated several times that this operation, this manufacturing methamphetamine, stopped prior to the first shipment of pseudoephedrine, which is the time that Mr. Ronho becomes part of the conspiracy. Relevant conduct cannot make him responsible for something that happened in the past, only what happened in the future. And we don't know how ---- we know that that lab did not operate from the moment that Mr. Ronho was part of that conspiracy. So he cannot be held responsible whether or not the children were put in harm. That's Mr. Timo, perhaps, the man manufacturing the meth, but not Mr. Ronho. So this enhancement under 2B1.1B5C, does it require that the likely harm to a minor be from the meth lab itself? That's correct. Well, what about ---- now, didn't he deal some methamphetamine? No. He only moved boxes of pseudoephedrine. He never touched any product once it was made. It was simply the boxes of pseudoephedrine. Okay. So he distributed some of that pseudoephedrine, but he didn't sell meth to my ---- No. He never sold drugs to anybody. He just simply unloaded the boxes and took some of the boxes to another location. He is completely unaware of any manufacturing or how it was conducted. If we were to give relief on the enhancement issue, there has to be a resentencing, correct? That's correct. Is it absolutely clear that we're looking at a clear and convincing evidence standard and not preponderance? Yes. According to Pike, which has established some new guidelines, Mr. Ronho's sentence was doubled, which is one of the requirements. It was a six-level enhancement, which also Pike mentions. It also is an enhancement for something that was not in the indictment, was not part of the charges, was not part of the conspiracy, was not an overt act, was not a matter of means. It's nothing that the government would have had to prove had they gone to trial. So his enhancement, his doubling of his sentence based on a fact that's not even part of the conspiracy, not even part of what the government says that they're going to prove, deserves a clear and convincing evidence standard. And again, the sentence of 324 months for someone like this is unreasonable. And I know that the issue of reasonableness is an issue that is pending before the Supreme Court and this Court. But I think on the facts of the case, somebody like Mr. Ronho to go to jail for 27 years when Mr. Amud got 46 months, Mr. Yager got 70, Mr. Roscoe got 135. He's got three times the sentence. Kennedy. You know why on this record that happened, though, don't you? What? You know why on this record that happened. Well, I know. Well, it's unclear why. Again, I know that the IAC or potential habeas has something to do with this attorney not entering into a plea agreement like the others. But still, not entering into a plea agreement shouldn't account for going from 46 months to 324 months. That can't be a fair and just way to proceed, whether it's under the guidelines or reasonableness or whatever. And Mr. Amud, who got 46 months, didn't even cooperate. He simply made a 5C statement. And he was more involved than Mr. Ronho. If the enhancement should not have been given, then it has to be resentenced. And we don't really get to reasonableness, right? Well, in this case, there was something unusual in that the original sentence was pre-Booker, so it was a guideline sentence. His first appellate attorney, appointed appellate attorney, filed a stay and asked for a remand on Ameline. So the case did go back to the judge only on that issue. And the judge did make a statement that he believed it was a reasonable sentence. So I think it is an issue that we would need to be revisited as well. Right. But I guess what I was saying was if we fought your argument that the enhancement for harm to a minor was incorrect, then the sentence would have to be vacated because the guideline calculation that the enhancement would be incorrect. That's correct. And we wouldn't really get to reasonableness. We would get to reasonableness as a final issue. After that. If everything is calculated right. Right. That's a possibility. If he was resentenced without the sixth-level enhancement, then he's looking at 168 months. And then there could be an argument, depending on what the judge then gives him, whether it's a reasonable sentence. Or it's 168 if he gets to the low end of the guidelines. It's unclear what the judge would do, obviously. I also think he's, even without the 5C, he's deserving of rule. He was the most minor participant of everybody in this case. But that's something that should have been presented to the district court. It was presented to the district court. And the district court didn't make a finding that he was the most minor participant. Well, the court clearly erred. The court did not look at the facts. The court didn't consider that there was all these other conspirators who are either fugitives or not yet indicted. There's someone over in the Middle East who's coordinating this whole thing. Oh, please. All the way down to Mr. Narongo. Every time we get a defendant in front of us, there's someone over in the Middle East or there's someone in Columbia who is a much bigger shot than he is. So, therefore, this guy is minor. I don't believe it. Well, that's the evidence from the government, that this operation began in the Middle East. And we know that they all do, not necessarily in the Middle East, but someplace. Right. And there's a kingpin there. Right. But we have all the other participants. It's not just that guy. It's all the people that were involved that were arrested and were sentenced. Ms. Blair, you may want to reserve the time you get for rebuttal. I appreciate that, Your Honor. Thank you. You may want to go to what at least you have a reason to suspect somebody on this panel sees as your big problem. What about the children? We just saw some toys. That's what was seen in the vicinity. And from that point on, we've got a sixth-level enhancement. Isn't that right? Yes, Your Honor. May it please the Court, Shannon Ryan for the United States. And focusing primarily on the sixth-level enhancement. You don't have to, but you might want to. That seems prudent, Your Honor. Right. This is an enhancement that requires two elements. First, that the offense involved the manufacture of methamphetamine. Second, that it created a substantial risk of harm to the life of a minor. It must be supported by clear and convincing evidence. It may, as with respect to any other matter under the guidelines, be based not necessarily on something of which a defendant has direct knowledge or involvement, but something that is reasonably foreseeable to a defendant within the course of the conspiracy. Now, in this case, I'd like to focus on three things. First, what the district court found with regard to this enhancement. Second, the district court's process just briefly in imposing this enhancement. And third, the factual underpinnings of the district court's ruling. First, with regard to the district court's ruling, the district court found not only that this was reasonably foreseeable to this defendant, Mr. Naranjo. What was reasonably foreseeable? The fact that there was the offense involved the manufacture of methamphetamine and that it created a substantial risk of harm to the life of a minor. But you see, the argument is that there was no manufacture. The manufacturing didn't take place during his time involved in the conspiracy. Does that matter? The government submits that it does not, Your Honor, for two reasons. First, just as a general matter, the language of the guidelines is that it involved the offense involved the manufacture of methamphetamine. It does not require, for example, that there be a then-operating methamphetamine laboratory. I suppose we'd agree with you on that point. Where do we get the children? With regard to the children, Your Honor, it is clear that this defendant on each of the three occasions he was unloading the large shipments of pseudoephedrine at the location that he saw children in the front yard playing, the four children who resided at this location. And this, just to give some perspective to the location, this is not a location that is out in a rural area or a very large location. This is a modest home in a residential area. The garage is detached, but the garage is a short distance from the residence, and the actual structure containing the meth lab was 8 to 10 feet behind that garage. The discussion that the district court focused on in finding that this defendant not only had reasonable foreseeability but had actual knowledge of the methamphetamine lab, one of the discussions the district court focused on was the discussion at which this defendant was present with Codefendant Gomez and Codefendant Orozco, and Codefendant Gomez told Codefendant Orozco, who owns the property, that Tamo, the meth cook or one of the meth cooks, should be told to move the lab so that this defendant and Gomez could start storing boxes of pseudoephedrine in that very location, because the presence of a meth lab, Defendant Gomez thought, might bring law enforcement scrutiny to that location, and he wanted to actually store boxes of pseudoephedrine there. Clearly, that conversation tells this defendant if the conversation is, move the meth lab that is there now, clearly that tells this defendant there is a meth lab there now. The fact that Tamo, an uncharged co-conspirator, was not at that very moment cooking methamphetamine does not diminish the district court's finding that this defendant knew of the existence of the meth lab. And with regard to the children, as I said, Your Honor, the four children were playing in the front yard on each of the three occasions that this defendant unloaded the pseudoephedrine. That was over a more than seven-month period. So it's clear from the record that this defendant knew that there was a meth lab at the location and knew that children were there in close proximity to that lab. The fact that you don't have meth cooking going on at that very moment, that you don't have this defendant involved in the actual cooking of the methamphetamine, those facts the government concedes, but the risk of harm that is posed to children as a result of this conduct, conduct which was not only reasonably foreseeable to the defendant, but which he knew full well was going on, that justifies this enhancement, and the district court found that. The district court's ---- Sotomayor, was there evidence that while he was conspiring unloading cartons over so many months, that that meth lab was in operation at that time? No, Your Honor. The evidence was that the actual cooking of methamphetamine at that location by Timo had ceased prior to the first pertinent delivery of pseudoephedrine. So if the lab had been shut down, this particular lab, had ceased functioning by the time he showed up and sees that kids live there, where's the threat of harm to minors if that lab's not functioning? Well, the district court found, Your Honor, that even though this was a non-operational lab, that it was actually a functioning lab. And by that, the record of the drug expert's testimony reveals that even though meth cooking was not actually going on at that time, that many of the ingredients necessary were present, that those ingredients pose a danger both individually and combination. The district court in this case, by the way, made very specific findings as to particular items that were found on the location. It was not just a general conclusion by the district court that, oh, we have what was a meth lab here, that's dangerous. The district court went into great detail in its findings identifying specific items that posed a danger, noting that some of the items not only were within the structure of the chicken coop, but also we had hundreds of gallons of acid in the garage where the unloading took place. We had respirators and other items, empty boxes in which pseudoephedrine had been contained throughout the backyard between the garage and the chicken coop. So the district court went into great detail describing what was the condition of that lab during the time of this defendant's participation, and finding that that condition during the time of this defendant's participation, even though there was no cooking, per se, going on, that it still, in its then state, posed a substantial risk of harm to minors. You know, the unspoken thing that's causing the government some concern, I assume it's a concern, maybe the government isn't concerned at all, but I assume you are, is the disparity of the sentencing. Yes. Your Honor, looking only at the result, what was this defendant's sentence, what were the sentences imposed on the other defendants, there's a disparity. But looking at what caused that disparity, it's clear what the district court's bases were. For example... It may be clear to you, but it's got to be clear to us. Yes, Your Honor. And what makes it clear to us? Well, the record makes clear. We see 324 months. Yes. And we see 46 months. And we look at the relative activity. Now, I know it's not our job to sentence, but that's why I say to you it's a sort of unspoken thing that's causing the government some concern. I assume it does. Yes, Your Honor. Well, how do you explain it? With respect, going just through a few of the co-defendants, Your Honor, with respect to co-defendant Orozco, who owns the property, he was sentenced to 168 months. He received a 5K departure for substantial cooperation of 10 levels. The difference under the guidelines between the sentence this defendant received, 324 months, and defendant Orozco's sentence, 168 months, is 10 levels. So his substantial cooperation accounts for that difference. It does as long as you don't consider the sixth-level enhancement. The sixth-level... You added the sixth-level enhancement on his 10 levels down for this, but six levels up. And we don't see it. It didn't happen. With respect to that defendant, defendant Orozco, Your Honor, the Court did impose a sixth-level enhancement. The Court found that because he owns that... No, I'm talking about... Yes, go ahead. I'm sorry, Your Honor. Go ahead. No, you go ahead. No. The Court found that because defendant Orozco, co-defendant Orozco, owns that his own children were living there, obviously, the Court applied that enhancement to that co-defendant. Contrary to the government's request and the probation officer's recommendation, with respect to co-defendant Yosri Jaber, J-A-B-E-R, the district court did not apply that enhancement. The government asked for that sixth-level enhancement, and the district court found that that defendant's connection to the property was not sufficient to support the enhancement. So certainly with respect to each of these defendants and what this defendant's involvement was, the district court paid particular attention to what facts supported that enhancement. With respect to co-defendant Emoud, Your Honor, the district court found that a minor role adjustment was appropriate, and defendant Emoud qualified for the safety valve. Defendant Emoud's involvement, as far as the government's evidence was concerned, only concerned this third and final delivery. Unlike his defendant, defendant Naranjo, the government had no evidence concerning other deliveries of pseudofedrin. It had no evidence concerning, as it did with defendant Naranjo, concerning his 12 to 14 deliveries of smaller amounts of pseudofedrin to Teimo, to other cooks, to middlemen. It had no evidence concerning, as it did with defendant Naranjo, of his dealings with co-defendant Gomez and the level of trust and confidence that Gomez placed in Naranjo indicating what was Naranjo's level of involvement in the conspiracy. So for all of those reasons, the district court applied a minor role adjustment to defendant Emoud, and because he came into proffer, defendant Emoud received the safety valve. So for those reasons, defendant – co-defendant Emoud's sentence was substantially lower than this defendant's sentence. So with respect to the – Everybody's sentence was substantially lower than this defendant's. It was, Your Honor. And as this Court had noted, if this defendant had elected to come in for a safety valve proffer, if this defendant had elected to cooperate, if this defendant had not involved himself in a conspiracy knowing that a meth lab was at a location where young children resided, if any of those things had happened, Your Honor, it's clear from the district court's other sentences that this defendant would not have been sentenced to 324 months. But because of defendant's own acts and what he did, the sentence resulted. This is not a case where the district court sentenced above the guidelines or gave anything other than a low-end sentence. And the district court on the ambling remand went in great detail through the facts that it found persuasive, the aggravating facts in this case. So it's clear from the record that the district court gave a sentence that it, upon consideration of the evidence, found to be reasonable. Certainly, it's a very high sentence. It's higher than the other co-defendants. There's no getting around that. But as to whether or not there are bases in fact and law for the sentence, as to whether or not the district court abused its discretion in evaluating these factors, the government submits that the record shows it did not. And, Your Honors, if the Court has no further questions, I'd submit. Thank you. Thank you. Thank you, Your Honors. I would like to point out a few things. First of all, Mr. Roscoe received a sentence of 135 months, not 168 months. He was held responsible for the methamphetamine lab. It was on his property. He was paid by the person making the meth. He saw the person go there every day to make the meth. It all happened before my client's involvement. He was also the chief informer. Exactly. So? So that doesn't have anything to do with it. Do you think that it's improper for a district judge to give substantial consideration to a guy who was the main informer? Well, I'm not disputing that. I'm saying that he got the six-level enhancement because he lived at the property. He was involved in the manufacture of the meth. Mr. Maranjo was not. Mr. Maranjo should not have gotten a six-level enhancement, regardless of whether there was 5K. Counsel. Counsel. Yes. How do you respond to the government's argument that when Mr. Maranjo was involved, although the meth lab was not cooking, still dangerous chemicals at the location? Well, first of all, Mr. Maranjo had no, there's absolutely no evidence that Mr. Maranjo knew about any of those chemicals. The evidence is clear from the record that the only things that were in the garage, which is the only place that Mr. Maranjo ever is, was camping fuel, which is a common item in many people's trash bag. Every other chemical, every other dangerous substance was behind a padlock door, behind the chickens, in a trap door, and it is the testimony of the guy. Ms. Blair, are you suggesting that your client was just an innocent bystander, happened to be paid a little money to load the car? Well, to unload and to load. He seems to be the one who paid less. Is that what this record shows in your view? Well, I'm, I was discussing the lab. There's absolutely no evidence that Mr. Maranjo, in fact, the cooperating co-defendant, stated under oath he never saw Maranjo in the area where the lab was. He never saw him in the hole in the lab. He never saw him with chemicals. He never told him someone manufactured meth on his property. His only job was to unload those boxes and to deliver them. And, yes, the evidence is that he was paid $500 each time. Mr. Mood, who got a minor role reduction, who drove from Chicago with one of the main people, who was the supervisor, didn't lift a single box, stood around while Mr. Maranjo lifted the boxes and was paid $5,000, got a minor role reduction. I'm not saying that Mr. Maranjo is not guilty. He pled to both counts, admitted his guilt, did not go to trial. He admitted his guilt. But his role from the evidence is clearly only the unloading of the boxes and the delivery of those boxes. He's not an innocent bystander to what he did and what he admitted to do. But he had nothing to do with that lab. He should not be held responsible for that lab, the way the chemicals were in there. And that goes to Staten as well, which states that the generic harm is not where this enhancement was supposed to be applied. There's always going to be harm when you manufacture meth. There's always going to be harm when there's chemicals. But that's not what this enhancement is. Kennedy. And there's quite likely to be harm when you distribute. He distributed pseudoephedrine. He did not distribute methamphetamine. There's no evidence about what happened to that pseudoephedrine. I mean, obviously, the charge is that he ate and embedded the manufacture of meth. We don't know how that occurred or where it occurred or anything like that. We don't know how it was manufactured. For all we know, it was manufactured in the safest, most possible way and where there were no children or anybody harmed. But that's why he can't be held responsible for what happened at this residence before he was there in a lab that he knew nothing about, that he never entered, that he never saw, that he never participated in. Kennedy. I think we understand your point. I'm just wondering how it's consistent with what this record shows. But your ---- As far as his participation or ---- You should represent your client. And I'm sure that's what you're trying to do. Yes. And I think the record shows that there's nobody who came in and ---- The record shows that he had to know. About the lab? Absolutely. The only statement made in his presence is, Gamis told Orozco to tell Timo to get your things out of there. That doesn't mean that Mr. Ronhom knew that the lab was there. Even if he knew the lab was there, he can't be held responsible for how the meth was manufactured there prior to his involvement. And we don't even know how it was manufactured there. The guideline requires not only that these chemicals and the way meth is manufactured, it has to be in a particularly harmful way. And we have absolutely no evidence of that, least of all clear and convincing evidence. Well, the only harmful thing is the ---- well, I shouldn't say that. The harmful thing that the record shows is it was residents of children. Right. But that does not have anything to do, again, with Mr. Ronhom. Mr. Ronhom saw children present when he unloaded boxes, but not ---- there's no evidence that he ever was even in that lab or knew what happened in that lab or how many times. The cooperating co-defendant said that he never even told Mr. Ronhom about the manufacture of meth on his property. So thank you, Your Honors. And I doubt that those ---- I think we understand your position. Okay. The case just argued is submitted. Thank you. The Court will take a brief recess.
judges: Farris, Gould, Cff, Duffy